# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

KATHI BOWMAN, INDIVIDUALLY )
AND ON BEHALF OF ALL OTHER )
PERSONS SIMILARLY SITUATED, )
            )
   Plaintiff,      )
            )
v.            )
            )  **Case No. 3:09-CV-16**
            )
CROSSMARK, INC.     )  **Jordan/Shirley**
            )
   Defendant.     )

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION

Stephen E. Fox, Admitted Pro Hac Vice
Natalie L. Arbaugh, Admitted Pro Hac Vice
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
(214) 747-5070 (phone)
(214) 747-2091 (fax)

and

Jerome D. Pinn, BPR #17848
Suzanne K. Roten, BPR #21788
WIMBERLY LAWSON SEALE WRIGHT &
DAVES, PLLC
550 West Main Avenue, Suite 900
P.O. Box 2231
Knoxville, TN 37901-2231
(865) 546-1000 (phone)
(865) 546-1001 (fax)

Attorneys for Defendant, CROSSMARK, Inc.

# TABLE OF CONTENTS

I.    SUMMARY OF OPPOSITION ....................................................................................1

II.   RELEVANT FACTUAL BACKGROUND....................................................................2

      A.     CROSSMARK Employs Thousands of Retail Representatives
             Nationwide Who Hold Different Positions and Are Assigned to
             Different Divisions and Teams. ...............................................................................2

      B.     CROSSMARK Compensates its Retail Representatives for In-
             Store Time, Certain Drive Time, and Administrative Time. .................................4

      C.     CROSSMARK Does Not Maintain a Policy Mandating
             Whether, When and Where Administrative Tasks are
             Performed..................................................................................................................6

      D.     A New Jersey Federal District Court Has Already Rejected the
             Same Conditional Class Certification Sought by Plaintiffs Here. .........................8

      E.     Despite Having Had Time and Opportunity to Gather Evidence,
             Plaintiffs Fail to Offer Sufficient Evidence to Justify Certifying
             a Nationwide Class. ...............................................................................................9

III.  ARGUMENT AND AUTHORITIES.............................................................................12

      A.     Legislative History and Legal Standard for FLSA Collective
             Actions ...................................................................................................................12

            1.     Congress Enacted the Collective Action Procedure of
                    "Opt-In" in Order to Ease the Burden on Employers
                    from Excessive and Needless Litigation...................................................12

            2.     Plaintiffs Overstate the Leniency of the Legal Standard
                    for Establishing that Conditional Collective Action
                    Certification is Appropriate. ....................................................................13

      B.     The Core Issue is Plaintiffs' Alleged Practice of Performing
             Certain Administrative Tasks At Home at the Beginning and
             End of the Workday. ..............................................................................................14

      C.     Plaintiffs Have Not Met Their Burden to Demonstrate that They
             Are Similarly Situated to Other Retail Representatives. .....................................17

            1.     Plaintiffs Lack Personal Knowledge to Support Their
                    Statements That They are "Similarly Situated" to All
                    Retail Representatives Nationwide....................................................18

             2.     Plaintiffs Have Offered No Evidence of a Common
                      Policy or Plan Requiring Retail Representatives to
                    Perform Administrative Tasks at Home Before
                    Beginning Their Workday and After Returning Home
                    from Their Last Work Location of the Day............................................20

D.     CROSSMARK's Policies and Practices, Even as Alleged by Plaintiffs, Do Not Violate the Law. ....................................................................24

E.     Class Certification is Also Unwarranted Because Plaintiffs Have Not Demonstrated a Sufficient Showing of Interest for Others to Join This Action. ...................................................................28

F.     Even if the Court Finds that Conditional Certification is Appropriate, the Scope of Plaintiffs' Proposed Class is Far Too Broad. ...............................................................................................31

G.     Plaintiffs' Proposed Notice and Consent Form Are Incomplete and Misleading. ................................................................................32

     1.     Plaintiffs' Notice Contains Improper, Misleading or Omitted Directives. ...................................................................32

     2.     Plaintiffs' Proposed Consent Form Also Is Misleading and Incomplete. .......................................................................34

IV.     CONCLUSION.................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Aiken v. Memphis*,
    190 F.3d 753 (6th Cir. 1999) ................................................................................16

*Barten v. KTK & Assocs., Inc.*,
    No. 8:06-cv-1574, 2007 WL 2176203 (M.D. Fla. July 26, 2007) ..........................29

*Belcher v. Shoney's, Inc.*,
    927 F. Supp. 249 (M.D. Tenn. 1996) ...................................................................34

*Bouaphakeo v. Tyson Foods, Inc.*,
    564 F. Supp. 2d 870 (N.D. Iowa 2008) .................................................................25

*Bros. v. Portage Nat'l Bank*,
    No. 3:06-94, 2007 WL 965835 (W.D. Pa. March 29, 2007) .............................33, 34

*Caremark, Inc. v. Goetz*,
    480 F.3d 779 (6th Cir. 2007).................................................................................16

*Clark v. Dollar General Corp.*,
    No. 3:00-0729, 2001 WL 878887 (M.D. Tenn. May 23, 2001) .............................31

*Davis v. Novastar Mortgage, Inc.*,
    No. 04-0956-CV-W-FJG, 2005 WL 3662438 (W.D. Mo. Dec. 13, 2005).............35

*Dolan v. Project Construction Corp.*,
    725 F.2d 1263 (10th Cir. 1984) ............................................................................13

*Freeman v. Wal-mart Stores, Inc.*,
    256 F. Supp. 2d 941 (W.D. Ark. 2003).............................................................13, 28

*Gorman v. Consolidated Edison Corp.*,
    488 F.3d 586 (2d Cir. 2007)..................................................................................26

*Grayson v. K-Mart Corp.*,
    79 F.3d 1086 (11th Cir. 1996) ..............................................................................13

*Heitmann v. City of Chicago*,
    No. 04-c-3304, 2004 WL 1718420 (N.D. Ill. July 30, 2004) .................................32

*Hoffman-La Roche, Inc. v. Sperling*,
    493 U.S. 165 (1989)....................................................................................... passim

*In re Wal-Mart Stores, Inc.*,
   395 F.3d 1177 (10th Cir. 2005).............................................................. 16

*IPB, Inc. v. Alvarez*,
   546 U.S. 21 (2005).............................................................................25

*Jiminez v. Lakeside Pic-n-Pac*,
   No. 1:06-CV-456, 2007 WL 4454295 (W.D. Mich. Dec. 14, 2007)......................................29

*Johnson v. Koch Foods, Inc.*,
   No. 2:07-CV-51, 2009 WL 3088559 (E.D. Tenn. 2009)............................................ 14

*Kavanagh v. Grand Union Co.*,
   192 F.3d 269 (2d Cir. 1999)........................................................................16, 17

*Kronick v. Bebe Stores, Inc.*,
   No. 07-4514, 2008 WL 4546368 (D.N.J. Oct. 2, 2008) ........................................13

*Kuebel v. Black and Decker*,
   No. 08-CV-6020, 2009 WL 1401694 (W.D.N.Y. May 18, 2009).........................16, 25, 26, 27

*Lemmon v. City of San Leandro*,
   538 F. Supp. 2d 1200 (N.D. Ca. 2007) ...............................................................28

*Lentz v. Spanky's Restaurant II Inc.*,
   491 F. Supp. 2d 663 (N.D. Tex. 2007) ....................................................25, 29, 30

*Mackenzie v. Kindred Hosp. E., L.L.C.*,
   276 F. Supp. 2d 1211 (M.D. Fla. 2003)...............................................................29

*O'Neal v. Kilbourne Medical Laboratories, Inc.*,
   No. 05-50, 2007 WL 956428 (E.D. Ky. March 28, 2007).....................................29

*Olivo v. GMAC Mortgage Corp.*,
   374 F. Supp. 2d 545 (E.D. Mich. 2004).........................................................14, 28

*Ray v. Motel 6 Operating, L.P.*,
   No. 3-95-828, 1996 WL 938231 (D. Minn. March 18, 1996) ................................24

*Reab v. Elecs. Arts, Inc.*,
   214 F.R.D. 623 (D. Col. 2002) .......................................................................34

*Reich v. New York City Transit Auth.*,
   45 F.3d 646 (2d Cir. 1995)...........................................................................28

*Rodgers v. CVS Pharmacy, Inc.*,
   No. 8:05-CV770T-27MSS, 2006 WL 752831 (M.D. Fla. March 23, 2006) .........................29

iv

*Shabazz v. Asurion Ins. Serv.*,
    No. 3:07-0653, 2008 WL 1730318 (M.D. Tenn. April 10, 2008) ..............................20, 21, 31

*Simmons v. T-Mobile USA, Inc.*,
    No. H-06-1820, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007).....................................14, 28, 29

*Smith v. Aztec Well Servicing Co.*,
    462 F.3d 1274 (10th Cir. 2006) ...................................................................................................16

*United Transp. Union Local 1745 v. Albuquerque*,
    178 F.3d 1109 (10th Cir. 1999) ...................................................................................................16

*Updite v. Delta Bev. Group, Inc*,
    No. 06-0593, 2006 WL 3718229 (W.D. La. Dec. 15, 2006) ...................................................33

*Valentine v. Harris County*,
    No. Civ. A. H-02-4910, 2003 WL 23741412 (S.D. Tex. Aug. 25, 2003) ..............................35

*Vega v. Gasper*,
    36 F.3d 417 (5th Cir. 1994) ........................................................................................................16

*West v. Verizon Communications, Inc.*,
    No. 8:08-cv-1325-T-33MAP, 2009 WL 2957963 (M.D. Fla. Sept. 10, 2009).................24, 25

*White v. MPW Industrial Services, Inc.*,
    236 F.R.D. 363 (E.D. Tenn. 2006)........................................................................................14, 15

*White v. Osmose*,
    Inc., 204 F. Supp. 2d 1309 (M.D. Ala. 2002) ....................................................................22, 23

## FEDERAL STATUTES

29 U.S.C. § 251................................................................................................................................12

29 U.S.C. § 254..................................................................................................................12, 16, 25

## REGULATIONS

29 C.F.R. § 785.35............................................................................................................................16

# I.    SUMMARY OF OPPOSITION

Plaintiffs purport to represent Retail Representatives from other divisions, under other supervisors, from different parts of the country, and with differing job duties and varying schedules. Yet after a year of discovery, Plaintiffs have not shown any evidence that they are similarly situated to their proposed class of putative plaintiffs. They have failed to show that conditional certification is warranted under any of the factors that courts utilize.

At the outset, Plaintiffs have not shown that what they claim is illegal—an alleged requirement to perform administrative tasks at home at the beginning and end of their workday without being compensated for commute time to and from home—is a common policy or practice among all retail representatives. In fact, CROSSMARK does not have common requirements for administrative time, and the evidence shows that the administrative tasks and drive times of Plaintiffs were instead the result of the individual practices. Without a common policy, the stark differences between different divisions and teams among the approximately 12,000 retail representatives make it impossible to adjudicate the intricacies of their administrative and drive time claims in the broad, representative fashion proposed by Plaintiffs.

Additionally, Plaintiffs have not shown that their underlying substantive claim has sufficient merit to justify certifying a large class, and they have not shown that there is sufficient interest from other potential plaintiffs to join this lawsuit. The lack of this evidence, along with the procedural and substantive difficulties in lumping disparate retail representatives together, confirms that there is no reasonable basis to expend judicial resources and stir up collective action litigation on these claims. For these reasons, conditional certification should be denied. In the alternative, if this Court should determine that conditional certification is proper, the scope of the class should be limited to those retail representatives who worked in Plaintiffs' specific positions only and who reported to Plaintiffs' specific supervisors.

1

## II.     RELEVANT FACTUAL BACKGROUND

### A.     CROSSMARK Employs Thousands of Retail Representatives Nationwide Who Hold Different Positions and Are Assigned to Different Divisions and Teams.

For more than a hundred years, CROSSMARK has provided sales, retail merchandising and inventory management services to the manufacturers of consumer goods, as well as the retailers that sell these goods.  (Andersen Decl. ¶ 3;[1] Bean Dep. 86–87;[2] Job Description.[3]) Headquartered in Plano, Texas, CROSSMARK provides these services by and through the efforts of employees referred to as "retail representatives."  (Andersen Decl. ¶ 3.)  The term "retail representative" is an umbrella term encompassing a group of over 12,000 employees nationwide, who have different roles, and who are divided into different divisions and, thus, perform varying duties, work in diverse territories, and report to different supervisors.  (*Id.*)

Retail representatives are employed either on a full-time, "regular" part-time, or part-time "surge" basis.  (Andersen Decl. ¶ 4.)  As the label suggests, full-time retail representatives generally work forty (40) hours per week on a consistent basis.  (*Id.*)  "Regular" part-time associates generally work less than forty (40) hours per week, but they are assigned regular, ongoing work and work objectives, whereas "Surge" part-time associates are employed on an "on-call" basis and work irregular hours from week to week. (*Id.*)

Ordinarily, retail representatives do not report to a local office.  Instead, they travel to different retail store locations to perform a myriad of job duties associated with merchandising and inventory management for various products and retailers. (Andersen Decl. ¶ 5.)

---

[1] References herein to "Andersen Decl." are to the Declaration of Lance Andersen, dated February 24, 2010, and attached hereto as Exhibit "1."

[2] References herein to "Bean Dep." are to the Deposition of Cheryl Bean, taken on February 10, 2010, attached as Exhibit "F" to the Declaration of Natalie L. Arbaugh ("Arbaugh Decl."), attached hereto as Exhibit "2."

[3] References herein to "Job Description" are to the document entitled "Job Description – Full Time/Part Time Retail Sales Representative," attached as Exhibit "19" to the deposition of Cheryl Bean.

2

Each retail representative is assigned to a specific division. (Andersen Decl. ¶ 6.) CROSSMARK has multiple divisions of retail representatives, including the "CROSSMARK Retail Team" ("CRT") division and the "Dedicated Team" divisions. (*Id.*) Retail representatives who are employed as part of the "CRT" division provide merchandising and inventory management services for a number of different consumer products in retail stores. (*Id.*) Retail representatives employed in the "Dedicated Team" division work for one particular client (*e.g.*, Dannon™ or Land O' Lakes™) and perform retail merchandising and inventory management services only for that client. (*Id.*) Each Dedicated Team has its own division according to their differing clients and duties. (*Id.*) For example, retail representatives working on the "General Mills Team" travel to a number of different retail stores to provide services for only General Mills™ products in those stores. (*Id.*)

Similarly, the CRT division is subdivided into discrete "teams." (*Id.* at ¶ 7) For example, some retail representatives employed in the "CRT" division work only at a particular chain of retail stores, but provide their merchandising and inventory services for a number of consumer products within those stores. (*Id.*) Thus, for example, a retail representative who works for the "Kroger Team" will only travel to Kroger stores to perform his/her work. (*Id.*)

Certain teams also perform only certain types of work, such as those representatives who are assigned to the "In-store Execution (ISE) Team." (Andersen Decl. ¶ 9.) Associates on the "ISE" team only perform "resets," which involve large-scale re-arranging of products on the shelves. ISE associates specialize in performing specific tasks, and they generally do not perform other types of merchandising or inventory services. (*Id.*)

Additionally, CROSSMARK assigns each retail representative to a specific supervisor to whom they report, and it provides each representative with a "geo-code"—a defined geographic

3

territory—so that they can be matched with stores in their area. (Andersen Decl. ¶ 8; Bowman Dep. 77:14–16, 80:4–5;[4] Bean Dep. 135:8–137:1.) The supervisors provide their assigned retail representatives with instructions and suggestions for best practices in performing their work, including, among other things, how and when to complete administrative tasks and how best to work in their stores. (Bowman Dep. 167:9–20, 182:19–25, 203:6–7, 213:16–214:9; Bean Dep. 183:1–6, 188:13–22, 216:19–217:4, 226:2–21, 228:3–14, 233:9–22; Andersen Decl. ¶ 8; Hackworth Decl. ¶ 4.)[5]

Plaintiff Kathi Bowman was employed by CROSSMARK as a part-time "Surge" retail representative from March 17, 2006 to July 31, 2008, when she was terminated for refusal to follow company policy. (Bowman Decl. ¶ 3; Bowman Dep. 74:2–9, 304:7–20.) Bowman was assigned to the "CRT" division, worked in eastern Tennessee, and reported to Malinda Hackworth. (Bowman Dep. 25:13–14.) Also assigned to the "CRT" division, Plaintiff Cheryl Bean was employed by CROSSMARK as a regular part-time retail representative from May 10, 2006 until October 13, 2008, at which time she was terminated for poor work performance within her assigned stores. (Bean Dep. at 72:21–24, 113:21–114:16.) Bean worked exclusively in Wal-Mart stores in the southeast region of Texas, and worked the majority of her tenure under the supervision of Michelle Oatman.[6] (*Id.* 117:19–118:15, 135:8–137:1, 141:3–11.)

**B.    CROSSMARK Compensates its Retail Representatives for In-Store Time, Drive Time, and Administrative Time.**

CROSSMARK requires all retail representatives to self-report the time they work by

---

[4] References herein to "Bowman Dep." are to the deposition of Kathi Bowman, taken on February 9, 2010, attached has Exhibit "E" to Arbaugh Decl.

[5] References herein to "Hackworth Decl." are to the Declaration of Malinda Hackworth, dated February 24, 2010, and attached hereto as Exhibit "3."

[6] Although she worked on the same team and was assigned to the same geographic area during her employment, Bean's supervisors changed from time to time. While she worked the majority of her tenure under the supervision of Ms. Oatman, her supervisors for a short time at the beginning of her tenure included Tricia Peterson and Pam Pitts. (*Id.* at 135:8–137:1.)

entering it into a proprietary computer program called SalesTrak. (Andersen Decl. ¶ 10; Bean Dep. 213:10–16.) Retail representatives record their time worked each day into different categories based upon the task performed, including "in-store" time, "administrative" or "admin" time, and "drive time." (Andersen Decl. ¶ 10; Bean Dep. 213:17–22.) CROSSMARK's policy is to compensate its retail representatives for all time worked, including time and a half for all overtime. (Bean Dep. 212:24–213:4, 258:15–260:2; Exhibit "C" to Austin Decl.[7])

Retail representatives perform their principal duties and responsibilities in their assigned stores.[8] (Andersen Decl. ¶ 11; Intro Packet, Ex. "22" to Bean Dep, at 2.) This work effort is referred to as "in-store time" and includes all the time that retail representatives spend working at their store location(s) throughout the day. (*Id.*) The principal duty of retail representatives is to properly position products on store shelves and displays for purchase by consumers. (*Id.*; Bowman Dep. 71:10–12; Bean Dep. 142:6–8.) To boost clients' retail sales, representatives maintain store shelf standards by ensuring products are: (1) set in the display correctly, according to "plan-o-grams," (2) priced properly, (3) tagged accurately, and (4) clean and organized. (Bowman Decl. ¶ 3; Bean Decl. ¶ 3; Andersen Decl. ¶ 11; Bowman Dep. 121:22–121:25, 123:1– 124:3, 125:3–4, 127:15–22; Bean Dep. 142:13–19, 145:24–147:8, 148:4-25) Additionally, retail representatives conduct inventory services, including: (1) ensuring products are sufficiently stocked, (2) removing out-of-date items, and (3) tracking competitors' inventory. (*Id.*)

Retail representatives are also compensated for "drive time." This category of time includes all time spent by representatives driving between their first store location of the day to

---

[7] References herein to "Austin Decl." are to the Declaration of Custodian of Records for CROSSMARK, Inc., Lisa Austin, dated February 24, 2010, and attached hereto as Exhibit "4."

[8] Not surprisingly, CROSSMARK describes its retail representatives as the "eyes, ears, and hands for [the] clients in a store" so that clients can be assured that their products are adequately stocked, displayed, and available for purchase at the stores. (Intro Packet at 2, attached as Ex. "22" to the deposition of Cheryl Bean.)

subsequent store(s) throughout the day. CROSSMARK also compensates its retail representatives for all time spent driving in excess of one (1) hour from their home to the first store of the day and all drive time in excess of one (1) hour from the last store of the day to their home. (Andersen Decl. ¶ 12; Exhibit "D" to Austin Decl.)

Administrative work (informally referred to as "admin time") includes the time that retail representatives spend confirming their work schedule, reviewing email, communicating with their supervisor when they are not in their assigned stores, completing expense reports, and reporting their work in SalesTrak. (Andersen Decl. ¶ 13; Hackworth Decl. ¶ 3; Bowman Decl. ¶ 8; Bean Decl. ¶ 9.) Regardless of where or when the work is performed, CROSSMARK pays its representatives for all admin time. (Bowman Decl. ¶ 8; Bean Decl. ¶ 9; Bowman Dep. 98:23–99:7; Bean Dep. 258:17–259:4; Hackworth Decl. ¶ 3; Exhibit "A" to Austin Decl.)

## C. CROSSMARK Does Not Maintain a Policy Mandating Whether, When and Where Administrative Tasks are Performed.

CROSSMARK does not require that administrative tasks be performed from a specific work location or at a specific time of day; rather, these tasks can be performed in any place where the retail representative has access to the Internet for computer-related tasks, and anywhere else for other tasks. (Andersen Decl. ¶¶ 14, 15; Hackworth Decl. ¶ 4; Bowman Dep. 209:16–22, 212:18–213:2; Bean Dep. 164:13–21, 216:1–5.) Significantly, representatives are not required to perform administrative tasks from home. For example, some retail representatives perform administrative tasks at a library or at Internet cafes. (Andersen Decl. ¶ 14; Hackworth Decl. ¶ 4; Bean Dep. 161:13–162:21.) Additionally, there is no company-wide requirement that representatives perform their administrative tasks at any particular time of day.[9]

_____

[9] CROSSMARK's practice during Plaintiffs' employment only required that associates report their time worked within twenty-four (24) hours of performing the work in their store location(s). (Andersen Decl. at ¶ 16.) In 2008, this policy changed to same-day reporting. (*Id.*)

(Andersen Decl. ¶ 15; Hackworth Decl. ¶¶ 5, 7.)  Nor is there a company-wide requirement on how often certain administrative tasks be performed—once a day, twice a day, or otherwise. (Andersen Decl. ¶ 17; Hackworth Decl. ¶ 7; Bowman Dep. 166:20–167:14, 212:18–213:15.) Further, the administrative tasks performed by retail representatives vary according to the representatives' division, team, duties, supervisor, client needs, and personal preferences. (Andersen Decl. ¶ 18; Hackworth Decl. ¶ 6.)

One of the starkest examples of the lack of uniformity in the performance of administrative tasks involves the work performed by retail representatives assigned to "ISE" teams.[10]  These representatives only perform "resets"—large-scale rearranging of products and store shelves—for clients.  (Andersen Decl. at ¶ 9; Bowman Dep. 52:1–9.)  This work is labor-intensive but, importantly, does not involve the performance of the administrative tasks that other retail representatives may perform.  (Andersen Decl. ¶ 9; Bowman Dep. 100:5–15, 101:17–23, 136:22–137:4.)  For example, while representatives like Bowman receive assignments and instructions from CROSSMARK via e-mail, "ISE" representatives receive instructions directly from their retailer-customers.  (Andersen Decl. ¶ 9.)  Moreover, unlike Bowman and Bean, ISE representatives do not receive Sales Plans, have no need to "plan activities" for store visits, rarely print out or complete paperwork or surveys, do not receive or distribute any Point of Purchase materials, and are not a part of the SalesTrak auto-assign scheduling system that assigned projects to Bowman and Bean.  (*Id.*)  Indeed, Bowman herself testified that when she performed "resets" (as opposed to her "normal work"), she did not perform administrative tasks. (Bowman Dep. 100:5–8, 136:22–137:4.).

Additionally, the performance of administrative tasks by CROSSMARK's "Dedicated

---

[10] Significantly, at least one third (1/3) of all of CROSSMARK's retail representatives are assigned to "ISE" teams.  (Andersen Decl. ¶ 9.)

Team" divisions can be quite different from those performed by retail representatives like Bowman and Bean. Dedicated Teams typically perform their administrative tasks of recording and reporting their work on hand-held devices issued by CROSSMARK. (Andersen Decl. ¶ 20; Bowman Dep. 216:15–217:16; Bean Dep. 245:5–247:10.) Significantly, Dedicated-team associates utilize their hand-held devices to perform administrative tasks at their assigned store work location(s). (*Id.*) In contrast, Plaintiffs' claims are premised on the allegation that they performed administrative tasks at home. (Bowman Decl. ¶¶ 7, 9; Bean Decl. ¶¶ 7, 9.)

Another factor that greatly affects whether, when and to what extent a retail representative performs administrative practices is the supervisor to whom the retail representative reports. Supervisors give varying instructions on the preferred times and methods for performing administrative tasks. (Bowman Dep. 167:9–20, 182:19–25, 203:6–7, 213:16–214:9; Bean Dep. 183:1–6, 188:13–22, 216:19–217:4, 226:2–21, 228:3–14, 233:9–22; Andersen Decl. ¶ 18; Hackworth ¶ 6.) For example, some supervisors suggest that their associates check e-mails twice a day, whereas other supervisors encourage their teams to be efficient and only perform these tasks once during their workday and only on days they have in-store time. (Bowman Dep. 166:20–167:14, 212:18–214:20; Andersen Decl. ¶ 22; Hackworth ¶ 6.)

Lastly, retail representatives' personal preferences and routines also affect the particulars of their administrative time. (Bowman Dep. 163:17–25, 171:2–172:7; Bean Dep. 161:19–162:21, 188:23–190:1; Andersen Decl. ¶ 18; Hackworth ¶ 6.) In short, there is no common policy regarding the performance of administrative tasks by retail representatives, but rather, individualized practices vary according to division, team, supervisor, and personal preferences.

**D.      A New Jersey Federal District Court Has Already Rejected the Same Conditional Class Certification Sought by Plaintiffs Here.**

In March 2008, three CROSSMARK retail representatives filed a lawsuit nearly identical

to the instant case in the U.S. District Court for the District of New Jersey (the "*Johnston* lawsuit"), claiming various deficiencies in CROSSMARK's pay policies and purporting to represent a nationwide class of similarly-situated retail representatives. (Johnston Pls.' Mot. for Cond. Cert., attached as Ex. "J" to Arbaugh Decl.)  Among other things, the plaintiffs in the *Johnston* lawsuit claimed that CROSSMARK failed to pay retail representatives for time spent driving to and from work. (*Id.* at 5.)  Like the instant case, the plaintiffs' drive-time theory was based on an argument that the commute time should be compensated because the representatives allegedly began and ended each workday performing administrative tasks at home. (*Id.*)

The *Johnston* plaintiffs moved for conditional certification of a nationwide class of all retail representatives for unpaid time allegedly spent performing administrative tasks and drive time incurred after and before the performance of administrative tasks. (*Id.* at 3.)  The court refused to conditionally certify a class on the admin time and drive time issues. (Order, Ex. "L" to Arbaugh Decl.)[11]  Because the *Johnston* Plaintiffs sought the same class on the same theories of recovery as here, and because Bowman and Bean rely on the very evidence submitted by the plaintiffs in the *Johnston* case, including affidavits and deposition testimony of the *Johnston* plaintiffs and affidavits of CROSSMARK representatives,[12] the court's ruling in *Johnston* is at least persuasive, and Bowman and Bean's argument to the contrary is simply wrong.

**E.**     **Despite Having Had Time and Opportunity to Gather Evidence, Plaintiffs Fail to Offer Sufficient Evidence to Justify Certifying a Nationwide Class.**

Kathi Bowman filed this lawsuit on January 12, 2009.  Cheryl Bean joined as a plaintiff October 28, 2009. (*See* Plaintiff's Complaint; Plaintiffs' First Amended Complaint.)  Plaintiffs

---

[11] The Court also rejected the *Johnston* plaintiffs' motion for reconsideration of its ruling on their motion for conditional certification. (*See* Order, attached as Ex. "O" to Arbaugh Decl.)

[12] Bowman and Bean have submitted some of the *Johnston* plaintiffs' deposition testimony in support of their Motion for Conditional Certification which is, of course, somewhat surprising given that the New Jersey District Court relied on this very same testimony to ***reject*** the Johnston plaintiffs' claim that all retail representatives employed by CROSSMARK were similarly-situated.

bring this lawsuit under the Fair Labor Standards Act ("FLSA") purportedly on behalf of themselves and all other similarly-situated retail representatives, alleging that CROSSMARK violated the FLSA by failing to compensate them and every other retail representative employed by CROSSMARK across the country for their first hour of drive time from their home to their first retail location at the beginning of their workday and for their first hour of drive time from their last retail location to their home at the end of their workday. (First Am. Compl. at ¶ 26.)

Recognizing that ordinary home to work drive time is not compensable under the FLSA, Plaintiffs theorize that, because they allegedly performed certain administrative tasks at their homes at the beginning of each workday before driving to their first retail location, under the "continuous workday" rule, they should have been paid for all of their drive time to the first retail store—not just their drive time in excess of one hour. (*Id.* at ¶ 18; Pls.' Memorandum in Support of Pls.' Mot. Conditional Cert. ("Pls.' Mem.") at 8.) Similarly, Plaintiffs contend that because they allegedly performed certain administrative tasks at home after returning from their last retail location of the day, they should have been paid for all of their drive time spent returning home—not just that time spent driving in excess of one hour to return home. (*Id.*) As Plaintiffs admit they were paid for all other time worked and recorded, their home-to-store and store-to-home drive time is the only time at issue in this lawsuit.[13]

Since the filing of this suit more than a year ago, the parties have completed a significant amount of discovery. CROSSMARK has (i) responded to thirty-four requests for production by producing almost 3,000 pages of documents, (ii) answered thirteen interrogatories, and (iii) responded to twenty-eight requests for admission. (Arbaugh Decl. ¶ 3.) Additionally,

---

[13] Plaintiffs admit that they were paid for (i) all of time spent driving between their various store locations and all time in excess of one hour spent driving from their homes to their first work location and from their last work location of the day to their homes, (ii) all time spent performing administrative tasks, (iii) all time spent performing in-store work, and (iv) all other time which they recorded in SalesTrak. (Bowman Dep. 99:3–7, 113:20–115:9; Bean Dep. 258:15–259:20.)

CROSSMARK has taken both Plaintiffs' depositions. (*Id.* at ¶ 5) Moreover, Bowman and Bean responded to requests for production from CROSSMARK, producing over 10,000 pages of materials, and answered eleven interrogatories. (Arbaugh Decl. ¶ 4.)

On December 30, 2009, nearly a year after filing the Original Complaint, Plaintiffs moved the Court to conditionally certify a class comprised of all former and current CROSSMARK retail representatives nationwide for the three (3) years preceding the filing of the lawsuit. (Pls.' Mot. Conditional Cert. 2.) In support of their motion, Plaintiffs submitted their own declarations, alleging that their duties and responsibilities were consistent with those of all other retail representatives throughout the country and that they performed the same administrative tasks every day at home before traveling to the store locations and after traveling back home from the store locations, which are consistent with the administrative tasks that all other representatives throughout the country performed. (Bowman Decl. ¶¶ 3–11; Bean Decl. ¶¶ 3–11.) In short, Plaintiffs attempt through their declarations to support their position that they are similarly-situated to all retail representatives across the country for purposes of their motion.

As discussed in more detail below, however, Plaintiffs' deposition testimony revealed that they wholly lack personal knowledge or any other proof to show that they are similarly situated to all other CROSSMARK retail representatives nationwide. Moreover, Plaintiffs testified in direct contradiction of their own declarations, rendering their credibility suspect. And, although Plaintiffs and their counsel have contacted many current and former CROSSMARK employees over the past year in an attempt to join additional plaintiffs to this lawsuit, Plaintiffs have identified no additional opt-in plaintiffs interested in joining this lawsuit. (Pls.' Mot. Conditional Cert. 1–2.) Plaintiffs' proffered evidence is insufficient to conditionally certify a class of retail representatives for the reasons discussed below.

## III. ARGUMENT AND AUTHORITIES

### A. Legislative History and Legal Standard for FLSA Collective Actions

#### 1. Congress Enacted the Collective Action Procedure of "Opt-In" in Order to Ease the Burden on Employers from Excessive and Needless Litigation.

Congress established the "opt-in" procedure for FLSA collective actions—which requires the affirmative opting-in and written consent of each party plaintiff—to ease burdens on employers in multiparty actions and lessen the onslaught of "excessive" litigation. *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 173 (1989). In the original 1938 FLSA statute, plaintiffs could bring a "representative" action to recover amounts due under the FLSA without any requirement for written consent of other plaintiffs. *Id.* Because this provision spawned excessive and needless litigation with plaintiffs lacking any personal interest in the outcome, Congress changed the procedure by enacting the Portal-to-Portal Act of 1947, which abolished the "representative" action and added the requirement for written consent of each plaintiff, while keeping the language that the plaintiffs must be "similarly situated." *Id.* This "opt-in" requirement distinguishes an FLSA collective action from a Rule 23 class action. As discussed in more detail below, the Portal-to-Portal Act also limited the definition of compensable time to specifically *exclude* normal home-to-work commute time, as well as activities that are "preliminary" and "postliminary" to the principal activities for which an employee is hired. 29 U.S.C. § 254, Pub. L. No. 49, §§ 5, 4, 61 Stat. 84.

In passing these changes, Congress made the specific finding that, unless the provisions of the original FLSA were changed, "the payment of such liabilities would bring about the financial ruin of many employers" and "the courts of the country would be burdened with excessive and needless litigation." 29 U.S.C. §251(a). Indeed, the Supreme Court has explained that Congress enacted the Portal-to-Portal Act for the purpose of "***limiting*** private FLSA

plaintiffs to employees who asserted claims in their own right and ***freeing employers*** of the burden of representative actions." *Hoffman-La Roche,* 493 U.S. at 173 (emphasis added). The Tenth Circuit has similarly explained that "[c]learly, Congress sought to limit the nature of a class action suit based upon an alleged FLSA violation" and "intended to severely limit the burden on the defendant." *Dolan v. Project Construction Corp.*, 725 F.2d 1263, 1267 (10th Cir. 1984) (overruled on other grounds). It is against this legislative back-drop that the legal standard for determining whether to certify an FLSA collective action was created.

2.      **Plaintiffs Overstate the Leniency of the Legal Standard for Establishing that Conditional Collective Action Certification is Appropriate.**

Plaintiffs overstate the leniency of the legal standard for determining whether a collective action is proper. Although district courts have the authority to conditionally certify a collective action and facilitate notice of that action to prospective plaintiffs, certification and notice are not mandatory, because "automatic preliminary class certification is at odds with the Supreme Court's recommendation to 'ascertain the contours of the [FLSA] § 216 action at the outset.'" *Kronick v. Bebe Stores, Inc.*, No. 07-4514, 2008 WL 4546368, at *2 (D.N.J. Oct. 2, 2008). *Accord Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Districts courts "have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation," and, thus the court's authority under FLSA § 216(b) must be exercised with discretion and only in appropriate cases. *Freeman v. Wal-mart Stores, Inc.*, 256 F. Supp. 2d 941, 944 (W.D. Ark. 2003) (quoting *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266–67 (D. Minn. 1991)).

Accordingly, although the initial stage of collective action certification is occasionally described as a "lenient" standard, lenient does not and cannot mean *non-existent*, and class certification certainly is not automatic. *Grayson v. K-Mart Corp.*, 79 F.2d 1086, 1096 (11th Cir. 1996). Plaintiffs, in fact, bear the burden of showing that putative opt-in plaintiffs are "similarly

situated" to the lead plaintiffs in their relevant duties, and that other similarly-situated individuals desire to join the lawsuit. *White v. MPW Industrial Services, Inc.*, 236 F.R.D. 363, 366–67 (E.D. Tenn. 2006) (discussing "plaintiff's burden" at the notice stage to "demonstrate that they and the proposed class members are similarly situated"); *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *5 (S.D. Tex. Jan. 24, 2007) (discussing authority for requiring plaintiff to show "that at least a few similarly situated individuals seek to join the lawsuit").

In determining whether plaintiffs have met their burden to show that employees are "similarly situated" for purposes of collective-action certification, district courts within the Sixth Circuit have based their decisions on a variety of factors. At the first stage, when minimal evidence is available,[14] courts consider (i) whether plaintiffs have demonstrated that they were victims of a common policy or plan that violated the law; and (ii) whether other potential plaintiffs have been identified and desire to opt-in. *White*, 236 F.R.D. at 367 (first factor); *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004) (second factor).[15] Here, Plaintiffs have failed to demonstrate the existence of both factors. Accordingly, the Court should deny Plaintiffs' Motion for Conditional Certification for the following reasons discussed.

**B. The Core Issue is Plaintiffs' Alleged Practice of Performing Certain Administrative Tasks At Home at the Beginning and End of the Workday.**

First, the core issue for purposes of determining whether conditional certification is

---

[14] When parties have had an opportunity to conduct pre-certification discovery, courts tend to hold plaintiffs to a higher standard of proof at the notice stage. *See Johnson v. Koch Foods, Inc.*, No. 2:07-CV-51, 2009 WL 3088559, at *5 n.1 (E.D. Tenn. 2009) (citing *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d at 896–97, and noting that court's application of a "more demanding standard" for conditional certification after discovery had been conducted). Because Plaintiffs here have been afforded both the time and the opportunity to gather evidence for class certification, the Court should consider all available evidence gleaned through discovery and hold plaintiffs to a higher standard of proof.

[15] At the second stage, when more evidence is available, courts also consider (i) the disparate factual and employment settings of the individual plaintiffs; (ii) the different defenses to which plaintiffs may be subject on an individual basis; and (iii) the fairness and procedural impact of certifying the action as a collective action. *White*, 236 F.R.D. at 367.

proper is whether Plaintiffs' alleged practices of performing certain administrative activities at home at the beginning and end of their workdays constitute a "common policy or plan that violated the law." *White*, 236 F.R.D. at 366, 372. In support of their position that they were subjected to a "common policy or plan that violates the law," Plaintiffs direct the Court to CROSSMARK's "uniform pay policies" generally, including its drive-time policy. (Pls.' Mem. 7, 12–13.) Significantly, however, neither CROSSMARK's "pay policies" in general nor its drive-time policy alone is relevant to certification.

Plaintiffs' legal theory that they are entitled to compensation for drive time is wholly premised on their allegation that they perform certain administrative tasks in their homes at the start and end of their workdays that are "integral and indispensable" to the "principal," in-store merchandising duties they performed. (Pls.' Mem. 5.; First Am. Compl. ¶¶ 15, 17.) Plaintiffs allege that because these administrative activities start and end their compensable "workday," all of their normal home-to-work commute time is converted into compensable work time under the "continuous workday" rule. (Pls.' Mem. 8.; First Am. Compl. ¶¶ 18, 25.) Plaintiffs are forced to rely on the continuous workday rule because they know that CROSSMARK's drive-time policy, standing alone, does not violate the FLSA.

CROSSMARK does not compensate for normal time spent commuting between home and the retail representatives' retail locations at the start and end of the workday, unless that time exceeds one hour. (Andersen Decl. ¶ 12; Exhibit "D" to Austin Decl.) This policy indisputably is a lawful way to compensate employees for their drive time, as it has been approved by the Department of Labor and courts across the country.

The FLSA expressly provides that employers are ***not*** required to compensate employees for time spent "traveling to and from the actual place of performance of the[ir] principal activity"

or for time spent on "activities which are preliminary to or postliminary to said principal activities." 29 U.S.C. § 254. This language specifically excluding ordinary home-to-work travel was enacted as part of the Portal-to-Portal Act to narrow the definition of compensable work. *Kuebel v. Black and Decker*, 2009 WL 1401694, at *8 (W.D.N.Y. May 18, 2009).

The U.S. Department of Labor ("DOL") regulations relating to travel time expressly confirm that time spent commuting from home to work is not compensable. 29 C.F.R. § 785.35. These provisions have consistently been upheld by courts, including the Sixth Circuit, re-affirming that "commute time is non-compensable under the FLSA." *Aiken v. Memphis*, 190 F.3d 753, 758 (6th Cir. 1999); *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 272 (2d Cir. 1999); *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1286 (10th Cir. 2006); *United Transp. Union Local 1745 v. Albuquerque*, 178 F.3d 1109, 112–21 (10th Cir. 1999); *Vega v. Gasper*, 36 F.3d 417, 424–25 (5th Cir. 1994). Thus, "[a]n employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not work time." *Kuebel*, 2009 WL 1401694 at *7 (citing 29 C.F.R. § 785.35).

Further, the DOL upheld the drive-time policy utilized by CROSSMARK in a January 1999 opinion letter.[16] *See* U.S. Dept of Labor Op., 1999 DOLWH LEXIS 9, at *5–6 (Jan. 29, 1999) ("We would not take exception to a practice that treats one hour of commuting time as non-compensable home-to-work travel, and that treats all travel time in excess of that amount as hours worked."); *Kuebel*, 2009 WL 1401694 at *8–9 (upholding policy that compensated retail specialists for commute time in excess of 60 minutes). As the Second Circuit found in

---

[16] "Given their provenance and legal effect, [DOL] opinion letters are entitled to great weight when they interpret the DOL's own (ambiguous) regulations." *In re Wal-Mart Stores, Inc.*, 395 F.3d 1177 (10th Cir. 2005). *Accord Caremark, Inc. v. Goetz*, 480 F.3d 779, 790 (6th Cir. 2007).

*Kavanagh*, the phrase "normal travel" is not an objective standard of how far most workers commute or are reasonably expected to commute, but rather "a subjective standard, defined by what is usual within the confines of a particular employment relationship." 192 F.3d at 273. Accordingly, home-to-work travel that is "a contemplated, normal occurrence," of employment is "normal travel" under the regulation." *See id.*

In short, CROSSMARK's drive-time policy is legal on its face and, recognizing this fact, Plaintiffs are forced to rely on the continuous workday rule and the attendant allegation that their administrative tasks at the beginning and end of their workdays convert their normal home-to-work commute time into compensable time. Accordingly, it is CROSSMARK's alleged practice of requiring retail representatives to perform certain administrative tasks *at home* and *at the beginning and end of their workdays* that allegedly makes CROSSMARK's drive time policy illegal; and it is these administrative practices, combined with the drive-time policy, that Plaintiffs must show is common to the proposed class. Focusing on these practices, Plaintiffs simply cannot make this showing.

**C.     Plaintiffs Have Not Met Their Burden to Demonstrate that They Are Similarly Situated to Other Retail Representatives.**

Plaintiffs have not offered sufficient evidence to support their contention that all full-time and part-time retail representatives nationwide perform substantially similar administrative tasks at the same location—in their homes—and at the same time—in the morning before driving to their first work location and immediately upon returning home from their last work location. Plaintiffs acknowledge that they lack personal knowledge concerning the performance of administrative tasks by other retail representatives, and they have offered no additional sufficient evidence to show that all retail representatives have been subjected to the alleged unlawful policy or plan. Accordingly, conditional certification is not proper.

1.    **Plaintiffs Lack Personal Knowledge to Support Their Statements That They are "Similarly Situated" to All Retail Representatives Nationwide.**

First, Plaintiffs wholly lack personal knowledge to support their allegation that they are "similarly situated" to all retail representatives nationwide.  (*See e.g.* Bowman Dep. 208:9–22, 217:12–16,; Bean Dep. 166:12–167:12.)   For example, Plaintiffs cannot show that all retail representatives nationwide perform the same general job duties as they did.  (Bean Decl .at ¶ 3; Bowman Decl. at ¶ 3).   Although Plaintiff Bean stated in her declaration she performed "the same general job duties performed by all of CROSSMARK's full time and part time Retail Representatives," she testified in her deposition in no uncertain terms that she, in fact, has no knowledge whatsoever of what any other retail representatives did on a daily basis for CROSSMARK.[17]   (Bean Dep. 166:12–167:12.)   Similarly, Bowman relied on CROSSMARK's job description to support her claim that all retail representatives performed the tasks, but she could not identify specific individuals with whom she has spoken about their job duties, nor could she identify names of *any* allegedly similarly situated employees other than a few who worked under her specific supervisor.[18]   (Bowman Depo. 145:7–149:25, 150:1–151:3, 178:15–

---

[17]  Additionally, Bean testified in direct contradiction to her declaration in a number of other ways. For example, in her declaration, she states that each day she worked for CROSSMARK, she determined her route of travel to each store location at her home before traveling to her assigned location for the day. (Bean Decl. ¶ 8).  In her deposition, she retracted this, admitting that she did not have to plan her travel given the regularity of the stores in which she worked.  (Bean Dep. 130:15–23, 204:12–20.)  Similarly, she testified in her deposition that she was not required to load point of purchase materials each day, and that "more often than not" she did **not** have to do this, contradicting her declaration.  (*Compare* Bean Decl. ¶ 8 *to* Bean Dep. 145:1–10, 206:8–10.)  And although her declaration stated that she generally spent "thirty minutes to an hour" performing administrative activities at her home, in her deposition, Bean's hyperbolic estimate was that she spent well over an hour performing her administrative tasks at the beginning *and* end of each workday.  (*Compare* Bean Decl. ¶¶ 8, 10 *to* Bean Dep. 211:8–212:4, 220:6–11, 222:2–16, 227:9–18.)  Bean's utter lack of credibility should call into question her claim that she is similarly-situated to other retail representatives nationwide.

[18]  Bowman similarly testified in her deposition in direct contradiction to her declaration. While she states in her declaration that she performed certain administrative tasks every day, she identified a number of tasks she did not have to perform everyday, as well as some days in which she performed no administrative tasks at all.  (Bowman Dep. 155:18–156:2, 294:16–20.)

180:1.) Bowman could not even identify the specific positions that were held by the other representatives who reported to her supervisor. (Bowman Dep. 90:10–15.)

Significantly, Plaintiffs also testified that they have no idea what retail representatives in other divisions and on other teams do, further proving that neither Bowman nor Bean can show they are similarly-situated to other retail representatives nationwide. For example, when asked about the other categories of retail representatives, Bean testified that (i) she never worked with any Dedicated-team or ISE-team representatives, (ii) she did not know how the general job duties assigned by Dedicated-team and ISE-team representatives differed from her general job duties, (iii) she did not know whether, when and where Dedicated-team and ISE-team representatives performed administrative tasks, and (iv) she did not know when Dedicated-team and ISE-team representatives began and ended their workdays. (Bean Dep. 240:24–242:13.). Similarly, Ms. Bowman has no knowledge or understanding of what ISE teams or Dedicated retail teams do. (Bowman Dep. 117:25–118:14, 206:20–207:10.) This lack of knowledge is significant. As set forth in detail above, stark differences exist among different teams of retail representatives, including the ISE and Dedicated-teams, which substantially affect whether administrative tasks are performed at all and if so, when, where and how frequently they are performed. *See* Section II.C, *supra*. Lacking personal knowledge regarding what retail representatives on other teams do, Plaintiffs have no proof—other than their conclusory allegations—to refute the existence of these differences.

At best, Plaintiffs' personal knowledge concerning what other retail representatives do is limited to the retail representatives on their team and who reported to the same supervisors. (Bowman Dep. 90:10–15, 145:7–151:3, 176:4–180:1; Bean Dep. 166:22–167:12, 242:19–245:4.) Indeed, both Plaintiffs testified that they cannot speak to the work performed by retail

representatives of other supervisors, or the instructions provided by supervisors other than their own. (Bowman Dep. 168:20–25, 178:4–12, 184:15–19; Bean Dep. 244:14–18.)

Nationwide conditional certification is not appropriate when proof is limited to particular regions or territories in which the class representative plaintiffs work.[19] *See Shabazz v. Asurion Ins. Serv.*, No. 3:07-0653, 2008 WL 1730318, at *5 (M.D. Tenn. April 10, 2008) (denying conditional certification for broader regional class when plaintiffs had only worked at Nashville call center and had "mere allegations" that were not based on personal knowledge as to Houston call center). Because Bowman and Bean wholly lack sufficient knowledge to show that retail representatives nationwide are similarly situated to them, conditional certification of a nationwide class should be denied.

### 2. Plaintiffs Have Offered No Evidence of a Common Policy or Plan Requiring Retail Representatives to Perform Administrative Tasks at Home Before Beginning Their Workday and After Returning Home from Their Last Work Location of the Day.

Plaintiffs fail to make even a "modest showing" that CROSSMARK's retail representatives nationwide are subject to a common policy or plan that requires the representatives to perform administrative tasks at home before leaving for their first work location of the day and at home immediately upon returning home from their last work location of the day. As discussed above, CROSSMARK does not maintain a policy mandating that administrative tasks be performed at a specific location such as home or at a specific time of day, and there is no company-wide requirement on how often certain administrative tasks should be performed—once a day, twice a day, or otherwise. *See* Section II.C, *supra*. Instead, whether, when, how and where administrative tasks are performed vary according to the representatives'

---

[19] Indeed, the one category of retail representatives that Bean claimed to actually have knowledge of was full-time representatives and in that case, she was adamant that full-time representatives are "different" than part-time representatives. (Bean Dep. 23:8–10, 24:13–25:1, 96:10–97:15, 236:19–237:14.)

division, team, duties, supervisor and personal preferences. *See id.* Any assertions by Plaintiffs to the contrary must fail by virtue of their own deposition testimony.

First, Plaintiffs assert in their declarations that they were "required to perform certain activities in my home" at the beginning and end of their workdays. (Bowman Decl. ¶¶ 7, 9; Bean Decl. ¶¶ 8, 10.) Significantly, in their depositions, neither Bowman nor Bean could identify any specific policy that required them to perform these administrative tasks in the manner they claimed to have performed them. For example, Plaintiffs could identify no policy requiring them to perform their administrative tasks at home. (Bowman Dep. 164:16–25, 193:4–16; Bean 164:14–21, 215:24–216:5.) Indeed, Plaintiffs testified that they sometimes performed their administrative tasks in places other than at home. (Bowman Dep. 209:16–22; Bean Dep. 161:13–162:21.)

Similarly, Plaintiffs could not identify a specific policy requiring them to perform their administrative tasks at a particular time of day, much less in the morning before beginning their work day and immediately after arriving home from their last work location. (Bowman Dep. 167:9–17, 202:24–203:5; Bean Dep. 230:15–231:8.)[20] In fact, for some administrative tasks, Plaintiffs admitted they did not even have to perform them every day, much less twice a day. (Bowman Dep. 155:18–156:2; Bean Dep. 130:15–23, 145:1–10, 204:12–20, 206:8–10.)

Moreover, Plaintiffs admitted in their depositions that they have no proof that any other retail representatives performed administrative tasks in the same manner, at the same place, and at the same times that they have asserted they performed their administrative tasks. (Bowman Dep. 168:20–25, 192:13–193:2, 205:9–13, 208:9–14, 217:12–16; Bean Dep. 195:1–14, 205:9–13, 212:14–23.) Indeed, after discussing every single administrative activity that Bean claimed

---

[20] While Plaintiffs testify in their depositions to vague and undefined "emails" supporting their claims, no such "emails" evidencing a common policy as to whether, where and when administrative tasks are performed exist.

in her declaration to have been "required" to perform, she could offer no proof in her deposition that any other retail representative performed similar tasks, much less performed those tasks at home before leaving for their first work location of the day and at home immediately upon returning home from their last work location of the day. (Bean Dep. 199:12–16, 203:24–204:11, 205:25–5, 207:22–208:3, 212:14–23, 215:5–10, 222:17–25, 227:1–8.)

In their motion, Plaintiffs attempt to gloss over this lack of evidence by pointing to an email sent to all retail representatives. They claim that a policy for "reporting time worked" is the relevant common policy that might bind a class together. (Bean Decl. Collective Ex. "A".) The email lists several examples of administrative time that would qualify for compensation, but it is not a "uniform policy" for how retail representatives are supposed to begin and end their workday. (*Id.*) The email is completely silent as to which, if any, of the listed activities are required to be performed, how often they are to be performed, where they are to be performed, or when they should be performed. The explanations of time categories are descriptions, not prescriptions. Plaintiffs have failed to show how anything in the subject-email requires or even advises retail representatives to perform the types of activities that Bowman and Bean undertook.

Similarly, the job description that Plaintiffs invoke is also not a common policy detailing how the retail representatives should begin and end their workdays. Instead, it is a general list of some of the duties and expectations for retail representatives and does not speak to the specific allegations that Plaintiffs make in their complaint. A plaintiff "must make some rudimentary showing of a commonality between the basis *for his claims* and that of the potential claims of the proposed class, ***beyond the mere facts of job duties and pay provisions***." *White v. Osmose*, Inc., 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002) (emphasis added).[21] "Without such a requirement,

_____

[21] Plaintiffs cite to several cases for the proposition that a similar job description alone will suffice for conditional certification. (Pls.' Mem. 12, 13.) These are either inapplicable or mischaracterized. In

it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Id.*

The deposition testimony offered by Bowman and Bean from the *Johnston* lawsuit in New Jersey is also insufficient proof and actually cuts against their very arguments. As noted, the New Jersey federal court reviewed the very same evidence relied upon by Bowman and Bean for the proposition that a nationwide class of retail representatives should be conditionally certified on the issue of whether the representatives were entitled to pay for drive time. The New Jersey court summarily rejected the request for conditional certification of a nationwide class on the basis that the *Johnston* plaintiffs had not met their modest burden of demonstrating that all representatives were similarly-situated to them.[22] (*See* Order.) The New Jersey court order is persuasive authority that, like the *Johnston* plaintiffs, Bowman and Bean are ***not*** similarly-situated to all retail representatives nationwide.

Proof of the individualized nature of these tasks is found in portions of Plaintiffs' depositions. They show that the type of administrative tasks and the amount of time that it takes to perform these tasks at the beginning and end of their day depends upon a variety of individualized factors. (Bowman Dep. 154:1–155:3, 163:17–25, 171:2–172:7; Bean Dep. 150:15–151:6, 161:19–162:21, 188:23–190:1, 206:4–10.) For example, while Bowman testified

---

*Keef* and in *Jackson*, the job description itself was the central issue of the case—relevant because of the alleged misclassification of managers despite their job descriptions. (2008 WL 3166302 at *2; 2009 WL 385580 at *5.) That is inapplicable here where it is not the job description that is singularly at issue in the case. Additionally, Plaintiffs mischaracterize *Goudi* to stand for the proposition that a similar job description alone "is sufficient." (Pls.' Mem. 12.) Instead, the *Goudi* court also relied on extensive deposition testimony along with documentary evidence in determining that plaintiffs were similarly situated. (2008 WL 4628394 at *6.)

[22] As in the instant case, the *Johnston* plaintiffs were unable to offer proof that CROSSMARK required retail representatives to perform the same administrative tasks at the same time and in the same location during the work day. Indeed, the Johnson plaintiffs testified that the job duties of retail representatives differed among divisions. (*See* Johnston Dep. 41:25–42:14.) Surprisingly, this testimony is offered by Bowman and Bean in support of their Motion for Conditional Certification.

that she would perform administrative tasks late at night, not immediately upon returning home, Bean testified she performed her tasks immediately upon returning home. (Bowman Dep. 288:5–17, 291:12–16; Bean Dep. 216:19–217:22.) Indeed, Plaintiffs admit that their own administrative time and drive time varied on a day-to-day basis, and they have no personal knowledge about whether and to what extent retail representatives on other teams and under other supervisors performed the same administrative tasks and drive time as they did. (Bowman Dep. 155:18–156:2, 168:20–25, 205:9–13; Bean Dep. 97:4–11, 203:1–15, 205:6–23, 212:14–23.) Plaintiffs' own personal practices, combined with the fact that their experiences are unique to their particular teams and supervisors, belie the existence of a "common policy or plan" concerning the performance of administrative tasks.

In sum, the evidence shows that the time when and place at which Plaintiffs performed their administrative tasks was not at the behest of a CROSSMARK "policy," but rather, based upon their own, unique individual choices. Conditional class certification is not appropriate when the evidence shows that there was no centralized policy, and that the alleged unlawful conduct was instead a result of isolated causes. *Ray v. Motel 6 Operating, L.P.*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. March 18, 1996) (denying conditional certification).

**D.      CROSSMARK's Policies and Practices, Even as Alleged by Plaintiffs, Do Not Violate the Law.**

Although the merits of the claim are generally not resolved at the conditional-certification stage, the merits of the claim may be relevant in determining whether class certification is appropriate. "Class certification issues cannot be decided in a vacuum." *West v. Verizon Communications, Inc.*, 2009 WL 2957963, at *4 (M.D. Fla. Sept. 10, 2009) (affirming denial of conditional certification when the merits of the case were considered while conducting the certification analysis). Indeed, it would be nonsensical and unfair to a defendant to proceed with

certification of a plaintiff's claim, thereby notifying tens of thousands of defendant's employees, if the claim was meritless or completely deficient. *See Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 894 n.19 (N.D. Iowa 2008) (explaining that "it would be unreasonable to proceed with certification if a plaintiff's claim was meritless or completely deficient"). Thus, several courts have refused to certify collective actions because the legal claims do not establish a violation of the FLSA. *See Lentz v. Spanky's Restaurant II Inc.*, 491 F. Supp. 2d 663, 670 (N.D. Tex. 2007) (holding that "to allow certification on a claim that has never been determined as a violation of the FLSA would unnecessarily burden all parties."); *West*, 2009 WL 2957963, at *4 ("It is entirely appropriate for the Court to be cognizant of the legal and factual issues presented by the case when determining whether this case can be appropriately treated as a collective action"). Here, the Court should deny certification because Plaintiffs' substantive allegations, even if taken as true, do not establish a violation of the FLSA.

As discussed above, the Portal-to-Portal Act amended the FLSA to expressly provide that employers are ***not*** required to compensate employees for time spent "traveling to and from the actual place of performance of the[ir] principal activity" or for time spent on "activities which are preliminary to or postliminary to said principal activities." 29 U.S.C. § 254(a). This language specifically excluding ordinary home-to-work travel was intended to narrow the definition of compensable work under the FLSA. *Kuebel,* 2009 WL 1401694, at *8.

Plaintiffs attempt an end run around the Portal-to-Portal Act exclusion by arguing that the administrative tasks they performed at the beginning and end of their workdays constituted "principal" activities. An activity is considered "principal" if it is "an integral and indispensable part of the principal activity for which [the employee is] employed" and not specifically excluded by the Portal-to-Portal Act. *IPB, Inc. v. Alvarez*, 546 U.S. 21, 30 (2005) (quoting

*Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)).  Although the Sixth Circuit does not appear to have undertaken an analysis of the distinction between the standards for "integral" and "indispensable," other courts have considered the issue at length.  *See Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 594 (2d Cir. 2007); *Kuebel,* 2009 WL 1401694, at *10.  While "indispensable" means only "necessary," the term "integral" adds the requirement that the activity be "essential to completeness . . . organically linked . . . [or] composed of constituent parts making a whole."  *See Gorman*, 488 F.3d at 592.  Therefore, unless an activity is so interconnected or "organically linked" to the principal duty which the employee was hired to perform, it is excluded from compensation under the Act.  *See id.*

Plaintiffs allege that because they performed administrative tasks at home, before and after the normal commute, these administrative tasks are "principal activities" or "integral and indispensable" to principal activities and, thus, all the time that followed these activities, including the ordinary home-to-work travel, was compensable.  (Pls.' Mem. 8.)  Plaintiffs' position is without merit and has been rejected by the Department of Labor and the courts.

Contrary to Plaintiffs' position, in its 1999 opinion letter, the DOL rejected the notion that at-home administrative tasks can create a basis for compensating otherwise non-compensable travel time.  U.S. Dept of Labor Op., 1999 DOLWH LEXIS 9 (Jan. 29, 1999). There, although the employer occasionally had "parts delivered directly to the home" of the employees, the DOL determined that the travel time spent driving between the employee's home and the job site was not compensable.  *Id.* at *3.  The employer then inquired whether administrative tasks performed at home, such as "time spent completing service or time allocation reports, checking voice mail, and checking email," would change the travel compensation analysis.  *Id.* at *4.  The DOL responded that the aforementioned tasks did not

make the home "a job site for purposes of counting work or travel" and further that "[c]ommunication between the employee and the employer at home ... with respect to assignments, instructions, work progress or completion would not, per se, affect the compensability of travel time" to different job locations. *Id.*

Furthermore, a New York district court has similarly rejected the same arguments raised by Plaintiffs here on strikingly similar facts. In *Kuebel v. Black & Decker*, a court denied claims from a group of "retail specialists" whose job duties are factually similar to those of Plaintiffs. 2009 WL 1401694 (W.D.N.Y. May 18, 2009). There, the principal duties of a retail specialist included making sure that Black & Decker products were "properly stocked, priced, and displayed" within assigned stores. *Id.* at *2. The tasks that the *Kuebel* plaintiffs performed at their "home offices" included "reviewing and responding to company emails, receiving directives from their managers, printing and reviewing sales reports, training on [a website], assembling point-of-purchase materials, and synchronizing the company-provided PDA." *Id.* The court held that these in-home activities were *not* principal activities, were *not* integral and indispensable, and did *not* render the commute time compensable under the FLSA. *Id.* at *10.

As in the *Kuebel* case, the principal job duties performed by Plaintiffs as retail representatives included making sure the products are set in the display correctly, priced properly, tagged accurately, clean, organized, and sufficiently stocked. (Andersen Decl. ¶ 11; Bowman Dep. 121:22–121:25, 123:1–6, 123:12–14, 123:20–124:3, 125:3–4, 127:15–22; Bean Dep. 142:13–19, 145:24–146:10, 146:19–147:8, 148:4–6, 148:23–25) Plaintiffs' at-home activities of checking and responding to emails, checking voicemails, inputting their time, printing paperwork, and planning their commutes were not integral *and* indispensable to their principal work. Like the administrative activities performed by the retail specialists in *Kuebel*,

none of these administrative activities are both "integral" and "indispensable" to Plaintiffs being able to ensure that products of CROSSMARK's customers were properly stocked, priced and displayed. (*See* Bean Dep. 154:19–161:9 (explaining that eleven out of her thirteen job duties were performed in the retail stores).) To hold that they are would effectively transform the "continuous workday" rule into a "continuous pay" rule. *See Lemmon v. City of San Leandro*, 538 F. Supp. 2d 1200, 1209 (N.D. Ca. 2007) (holding that police officers' commute time was *not* compensable because of the Portal-to-Portal Act's exclusion, despite at-home donning and doffing of their uniforms); *Reich v. New York City Transit Auth.*, 45 F.3d 646, 653 (2d Cir. 1995) (denying compensation for canine unit police officers' commute time, despite the fact that the officers performed work in caring for their dogs at home before and after the workday). Surely, that is not what Congress intended when it narrowed the scope of compensable time with the enactment of the Portal-to-Portal Act. Accordingly, these tasks are not "principal activities" that render Plaintiffs' commute time compensable.

In sum, Plaintiffs' meritless position should not suffice as a basis for certifying a nationwide class of thousands of CROSSMARK employees. To do so would be a violation of the letter and the spirit of the FLSA and would result in an improper "'stirring up' of litigation through unwarranted solicitation." *Freeman*, 256 F. Supp. 2d at 944.

E.    **Class Certification is Also Unwarranted Because Plaintiffs Have Not Demonstrated a Sufficient Showing of Interest for Others to Join This Action.**

In addition to a common policy or plan that violates the law, "[o]thers' interest in joining the litigation is relevant to deciding whether or not to put a defendant employer to the expense and effort of notice to a conditionally certified class of claimants in a collective action." *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *9 (S.D. Tex. Jan. 24, 2007); *Olivo v. GMAC Mortgage Corp.*, 374 F.Supp.2d 545, 548 (E.D. Mich. 2004).

Conditional class certification and notice to a potential class is not appropriate to determine *whether* there are others who desire to join the lawsuit. *See Mackenzie v. Kindred Hosp. E., L.L.C.*, 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003) (citing *Dybach v. State of Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567–68 (11th Cir. 1991)). "Rather, a showing that others desire to opt-in is required before certification and notice will be authorized by the court." *Barten v. KTK & Assocs., Inc.*, No. 8:06-cv-1574, 2007 WL 2176203, at *2 (M.D. Fla. July 26, 2007).

Numerous courts in this Circuit and others require proof "that at least a few similarly situated individuals seek to join the lawsuit" before granting conditional class certification. *Simmons*, 2007 WL 210008, at *9. For example, in *O'Neal v. Kilbourne Medical Laboratories, Inc.*, No. 05-50, 2007 WL 956428 (E.D. Ky. March 28, 2007), the Court refused to certify a class when the plaintiff, despite an opportunity for discovery, had "not made any factual showing that there [were] any other potential plaintiffs . . ." 2007 WL 956428, at *7. The Western District of Michigan likewise has denied certification where "Plaintiffs [had] six months of discovery" and yet "obtained a consent to opt-in and an affidavit from only one potential plaintiff." *Jiminez v. Lakeside Pic-n-Pac*, 2007 WL 4454295, at *5 (W.D. Mich. Dec. 14, 2007). Similarly, in *Lentz*, the Court refused to certify a collective action because the plaintiff "failed to identify potential plaintiffs other than one additional person" who had filed notice with the court. 491 F. Supp. 2d at 669. The *Lentz* court emphasized that at least a few people must show interest, not just one. *Id.; see also Barten*, 2007 WL 2176203, at *3 (refusing to certify when plaintiffs had "identified only one viable opt-in plaintiff" in eleven months since initiating efforts to locate opt-in plaintiffs); *Rodgers v. CVS Pharmacy, Inc.*, No. 8:05-CV770T-27MSS, 2006 WL 752831, at *4 (M.D. Fla. March 23, 2006) (plaintiff failed to provide sufficient evidence of other employees' desire to opt-in when he only offered his own affidavit and that of two other former employees).

In this case, Plaintiffs have had almost a year to generate interest in their collective action and to secure the consent of other opt-in plaintiffs. They have had more than sufficient time to contact persons with whom they worked, including persons assigned to the same supervisors, and invite them to join the lawsuit. Additionally, during the conditional discovery phase of the lawsuit, Plaintiffs gained access to many names, email addresses, and phone numbers of other retail representatives from documents produced by CROSSMARK and documents already in the possession of Plaintiffs. (*See* BOWMAN0450–56, CMK0001345–1352, BOWMAN0666–668; attached to Arbaugh Decl. as Exhibits "G," "H," "I;" Bean Dep. 34:15–35:8, 35:25–37:8.) Plaintiffs also have had access to the court filings from the New Jersey litigation and the opportunity to contact counsel from that case. (Arbaugh Decl. at ¶ 3.) Moreover and perhaps most importantly, Plaintiffs' counsel has throughout the past year directly solicited other retail representatives to join this action, in some cases repeatedly contacting them to persuade them to join the lawsuit without success. (*See* Pl.'s Resp. to Interrogatory No. 5;[23] Hackworth Decl. ¶¶ 8–10; Chesney Decl. ¶ 3;[24] Thomas Decl. ¶¶ 3, 4.[25])

Clearly, Plaintiffs have long had access to contact information for other retail representatives and, in fact, used that information in an attempt to solicit other representatives to join this lawsuit. Nevertheless, Plaintiffs have filed only one opt-in consent form as of this date—Plaintiff Bean was added to this lawsuit in October of 2009. As the *Lentz* court admonished, conditional certification is *not* warranted if merely one other person desires to join the lawsuit. *Lentz*, 491 F. Supp. 2d at 669. Instead, if Bean is the only other person interested in joining this suit, then it should proceed as an action of Plaintiffs on their individual behalves.

---

[23] Plaintiff's Response to Defendant's Conditional Certification Interrogatories is attached as Ex. "D" to Arbaugh Decl.
[24] The Declaration of Shirley Chesney, dated February 24, 2010, is attached hereto as Exhibit "5."
[25] The Declaration of Sandra Thomas, dated February 19, 2010, and attached hereto as Exhibit "6."

**F.      Even if the Court Finds that Conditional Certification is Appropriate, the Scope of Plaintiffs' Proposed Class is Far Too Broad**.

Plaintiffs are not similarly situated to a class that would encompass all retail representatives nationwide and in all divisions. "It is plaintiffs' responsibility to prove to the Court the scope of the alleged violations of the FLSA" and the Court cannot allow certification of a huge, diverse class unless Plaintiffs make a strong showing that alleged violations occurred beyond their own experiences. *Clark v. Dollar General Corp.*, No. 3:00-0729, 2001 WL 878887, at *5 (M.D. Tenn. May 23, 2001) (holding that the allegations of FLSA violations in seven stores was "insufficient to prove a nationwide policy or practice."); *Accord Shabazz*, 2008 WL 1730318 at *5.

Here, Plaintiffs have failed to demonstrate that they can represent a class as large and diverse as one that would include all retail representative divisions and teams. Importantly, Plaintiffs were both a part of teams in the CRT division and have not shown that they are similarly situated to retail representatives on other teams or in other divisions—particularly the "Dedicated Teams" divisions and the "ISE" teams. They testified that they are wholly unknowledgeable as to these teams' duties, their administrative practices, or even their existence. (Bowman Dep. 168:20–25, 117:25–118:14, 206:20–207:3, 208:9–22; 217:12–16; Bean Dep. 166:12–167:12, 240:24–247:10.) And because these teams are very different in their relevant duties and practices, lumping all of them into one class would create an unmanageable adjudication of the relevant legal issues involving administrative tasks. *See* Section II.C, *supra*.

Additionally, Plaintiffs have not shown that they have any relevant knowledge beyond the communications they had with their own supervisors. (Bowman Dep. 149:11–151:3, 178:4–180:1, 184:15–19; Bean Dep. 166:22–167:12, 244:14–18.) Instead, their testimony reveals that many of the tasks they performed at the beginning and end of their workday were encouraged or

communicated to them by their individual supervisors. (Bowman Dep. 167:9–20, 182:19–25, 203:6–7, 213:16–214:9; Bean Dep. 183:1–6, 188:13–22, 216:19–217:4, 226:2–21, 228:3–14, 233:9–22.)  Therefore, if the Court does find that class certification is appropriate, the class should be limited to the teams supervised by the persons who supervised Plaintiffs—as to Bowman, part-time "surge" retail representatives on the CRT Team under the supervision of Malinda Hackworth and, as to Bean, regular part-time retail representatives on the Wal-Mart CRT Team under the direction of Michelle Oatman.

**G.**     **Plaintiffs' Proposed Notice and Consent Form Are Incomplete and Misleading.**

If conditional certification is granted and notice is authorized, the notice must be fair and accurate.  *See Hoffman-La Roche*, 493 U.S. at 169, 172-73.  Accordingly, CROSSMARK respectfully requests that, if the Court grants conditional certification, it approve the fair and impartial notice and consent form proposed by CROSSMARK.

**1.**     **Plaintiffs' Notice Contains Improper, Misleading or Omitted Directives.**

Notice of an FLSA collective action must provide putative plaintiffs with an accurate perception of the litigation by including a fair and impartial explanation of both the issues in the case and the options available to prospective plaintiffs.  *See Heitmann v. City of Chicago*, No. 04-c-3304, 2004 WL 1718420, at *6 (N.D. Ill. July 30, 2004).  Because court-facilitated notice serves to prevent "misleading communications" and "misuse of the class device," courts have "both the duty and the broad authority to exercise control over a class action" by monitoring the preparation and distribution of notice, including the consent forms, to "ensure that it is timely, accurate, and informative."  *Hoffman-La Roche*, 493 U.S. at 171.

Plaintiffs' proposed notice does not meet this standard.  Specifically, Plaintiffs' notice improperly suggests that the notice is a formal court pleading; improperly suggests Plaintiffs are entitled to recover all unpaid wages, rather than all unpaid overtime wages as permitted by the

FLSA; does not include a neutral statement of CROSSMARK's position; and fails to fully inform putative plaintiffs of their obligations if they join this lawsuit. CROSSMARK has attached a notice as Exhibit "7" that remedies these shortcomings and is more simple, clearly organized, easily understood. and even-handed than the notice proposed by Plaintiffs.

### a.     Notice Should Not Include the Court Caption.

Although the form and contents of the notice must be approved by the court, the notice itself is a letter from Plaintiffs' counsel, ***not*** a notice or summons served by the court. *See Hoffman-La Roche*, 493 U.S. at 171.  Accordingly, Plaintiffs' proposed notice, which has the appearance of a court document, is improper and likely to cause confusion.  (Pl.'s Ex. 8 at 1). Sending notice in a letter format, as opposed to the misleading appearance of a court document, is also consistent with notice forms approved by other courts.  *See, e.g., Updite v. Delta Bev. Group, Inc.*, No. 06-0593, 2006 WL 3718229, at *7 (W.D. La. Dec. 15, 2006).

### b.  Notice Should Accurately Describe the Nature of Plaintiffs' Claim and Include A Neutral Statement of CROSSMARK's Position.

Section 2 of Plaintiffs' proposed notice sets forth their allegations in substantial detail, but it improperly states that Plaintiffs are entitled to recover all "unpaid wages and overtime compensation," rather than only overtime compensation as permitted by the FLSA, and does not include a similar statement in its description of the lawsuit informing recipients of CROSSMARK's position concerning these allegations.  (Pls.' Ex. "8" at 2.)  Plaintiffs' statement of their claim is overbroad and suggests that putative class members may recover more than is permitted under the FLSA.  If Plaintiffs seek to recover regular (*i.e.*, non-overtime) wages in excess of the hours for which they were compensated, Plaintiffs essentially state a "gap-time claim."  *See, e.g., Bros. v. Portage Nat'l Bank*, No. 3:06-94, 2007 WL 965835, at *5 (W.D. Pa. March 29, 2007).  "The vast majority of federal courts hold that where there is no alleged

violation of the minimum-wage provision in § 206, such claims do not come within the FLSA's purview." *Id.* (citing *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1279) (4th Cir. 1996)). Plaintiffs' claim should be narrowed and appropriately described in the collective action notice only as a claim for unpaid **overtime** wages.

The notice, if issued, also should include a detailed description of CROSSMARK's position regarding Plaintiffs' claims. A complete description of both parties' claims is necessary to fulfill the court's obligation to ensure the issuance of an accurate and informative notice, and is consistent with the notice forms often approved by district courts. *See Hoffman La-Roche*, 493 U.S. at 171; *Belcher v. Shoney's, Inc.*, 927 F. Supp. 249, 253 (M.D. Tenn. 1996).

### c. Notice Should Fully Inform Potential Class Members of Obligations Associated with Participating in Lawsuit.

Section 6 of Plaintiffs' proposed notice fails to fully inform potential plaintiffs of all their obligations if they join the suit. Specifically, the notice should inform potential class members that if they join the lawsuit, they may be required to (i) appear for a deposition in Knoxville, Tennessee; (ii) respond to written discovery; and (iii) appear at a trial in Tennessee. *Reab v. Elecs. Arts, Inc.*, 214 F.R.D. 623, 630 (D. Col. 2002).

### 2. Plaintiffs' Proposed Consent Form Is Also Misleading and Incomplete.

If a district court determines that notice to potential class members is warranted, it has an obligation to approve the notice and consent forms so that "present and after-the-fact disputes between counsel as to [the] form and manner of consent may be eliminated." *Krueger*, 1993 WL 276058, at *3 (citing *Hoffman La-Roche*, 493 U.S. at 170)). As with their proposed notice, Plaintiffs' proposed consent form is misleading and incomplete. Specifically, Plaintiffs' proposed consent form (i) improperly suggests that any opt-in class members will be represented directly by Plaintiffs' counsel, rather than clearly explaining that the individual is naming

Bowman and Bean as his or her representative; (ii) explains the impact of the retention of counsel by Bowman and Bean in this matter; and (iii) fails to include an acknowledgement of the effect of joining the class, including participation in discovery and trial. *See, e.g., Davis v. Novastar Mortgage, Inc.*, No. 04-0956-CV-W-FJG, 2005 WL 3662438, at \*4 (W.D. Mo. Dec. 13, 2005); *Valentine v. Harris County*, No. Civ. A. H-02-4910, 2003 WL 23741412, at \*3 (S.D. Tex. Aug. 25, 2003). CROSSMARK's proposed consent form remedies these shortcomings.

## IV. CONCLUSION

WHEREFORE, Defendant CROSSMARK, INC. prays that this court deny Plaintiffs' request for conditional collective action certification; deny Plaintiffs' request to notify proposed class members; and grant Defendant all such other relief to which it may be entitled.

Dated: February 24, 2010                                     Respectfully submitted,


                                     /s/ *Natalie L. Arbaugh*
                                     Stephen E. Fox, Admitted Pro Hac Vice
                                     Natalie L. Arbaugh, Admitted Pro Hac Vice
                                     FISH & RICHARDSON P.S.
                                     1717 Main Street, Suite 5000
                                     Dallas, Texas 75201
                                     Telephone: (214) 747-5070
                                     Facsimile: (214) 747-2091

                                     Local Counsel:

                                     Jerome D. Pinn, BPR #17848
                                     Suzanne K. Roten, BPR #21788
                                     WIMBERLY LAWSON SEALE WRIGHT &
                                     DAVES, PLLC
                                     550 West Main Avenue, Suite 900
                                     P. O. Box 2231
                                     Knoxville, TN 37901-2231
                                     Telephone: (865) 546-1000
                                     Facsimile: (865) 546-1001

                                     Attorneys for Defendant, CROSSMARK, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing Answer has been filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

*/s/ Natalie L. Arbaugh*
Natalie L. Arbaugh