IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| KATHI BOWMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHER PERSONS SIMILARLY SITUATED, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 3:09-CV-16 |
| CROSSMARK, INC., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the court is plaintiffs' "Motion for Conditional Certification of Collective Action and for Court Approved Notice to Members of Collective Class" [doc. 18]. Defendant has filed a response in opposition to the motion [doc. 26], and plaintiffs have submitted a reply [doc. 32]. Defendant requested [doc. 34] and was granted permission [doc. 45] to file a sur-reply brief [doc. 46]. The plaintiffs' motion is ripe for the court's consideration, and oral argument is not necessary. For the reasons that follow, the motion will be denied.

This civil action alleges violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and is brought as a collective action pursuant to 29 U.S.C. § 216(b).[1] Plaintiffs are seeking compensation for drive time at the beginning and end of their workday.

---

[1] The original plaintiff, Kathi Bowman, has also brought individual claims based on state and federal law against the defendant.

I.

*Background*

Defendant, Crossmark, Inc. ("Crossmark"), provides sales and retail merchandising and inventory support services to retailers and consumer goods manufacturers. These services are provided by employees called "retail representatives." According to Crossmark, this group includes more than 12,000 employees nationwide who are divided into different divisions and who perform different roles and duties. The representatives are also located in different territories and report to different supervisors. The supervisors provide retail representatives with instructions and suggestions regarding how best to perform administrative tasks and their store work assignments. Retail representatives are employed full time, regular part-time, or surge part-time. Full-time representatives work 40 hours per week; regular part-time representatives generally work less than 40 hours per week but do receive regular ongoing work assignments and objectives. Surge part-time representatives are employed on an "on-call" basis and work irregular hours. Crossmark considers retail representatives non-exempt under the FLSA and pays them on an hourly basis.

There are multiple divisions of retail representatives. One such division is the Crossmark Retail Team ("CRT") whose representatives provide merchandising and inventory management services for different consumer products in retail stores. There are also discrete teams within the CRT division whose representatives work only in a particular chain of retail

stores but provide inventory and merchandising services for a number of products within those stores. An example would be representatives who work on the Kroger Team and only travel to Kroger stores to perform their work.

Another division is the "Dedicate Team" whose members work for a particular client such as Dannon™ or Land O' Lakes.™ Retail representatives on a dedicated team perform merchandising and inventory services for only one client in different retail stores. There is also the "In-Store Execution ("ISE") Team whose members only perform resets. Members of this team perform large-scale product re-arrangements on shelves and generally do not perform other types of inventory or merchandising services.

Crossmark has a standard job description for a Retail Representative that includes a list of "Essential Duties and Responsibilities." That list states that a retail representative:

1. Schedules tasks on weekly basis to meet execution objectives
2. Executes retail merchandising tasks as scheduled
3. Performs stores/tasks in efficient/cost effective manner
4. Accurately reports all completed retail tasks via the appropriate designated systems on the day the work is performed
5. Communicates effectively with store personnel regarding tasks, sales activities, promotions, and client/sales plan objectives
6. Completes required training and certification programs
7. Engage every workday with CROSSMARK'S communication tools for the purpose of accurately planning, reporting, and reviewing work
8. Ability to implement retail schematics and merchandising materials as assigned

9. Flexibility to participate in team scheduled tasks and clients work-withs
10. Dedicated to providing excellent customer service and to develop a professional working relationship with store management, associates and other merchandising companies to effectively meet company and client objectives
11. Insures proper maintenance on all company equipment
12. Follows company policies, procedures, and position responsibilities

The job description also notes that representatives may be required to perform other job-related tasks as directed by management than those listed.

> Crossmark defines administrative time as:
>
> Time spent opening and sorting cycle mail, communicating with your supervisor when not in the store, completing expense reports, printing, synchronizing (setting up), reporting store calls and all activities through SalesTrak. Associates should NOT simply use a rule of thumb that Admin Time is about 15 or 30 minutes per day. Instead, associates are expected to record actual Admin Time worked.

Crossmark also has a "Drive Time" policy related to retail representatives which states as follows:

> Non-exempt associates are "on the clock" once the associate arrives at the first work location of the day and goes "off the clock" once the associate leaves the last work location of the day. Drive time between work locations during the day is to be recorded as time worked. Time spent on personal stops and lunch breaks between work locations is not considered drive time. However, the theoretical drive time between store locations will be paid in the event the associate deviates from their recommended coverage routes for personal stops . . . .

4

> For retail associates, certain territories/work assignments may require longer than normal drive times to the first work location of the day. For those assignments, the associate will "go on the clock" after the first hour of drive time and will go "off the clock" at the beginning of the last hour of travel home. The supervisor will determine if this applies to the associate. Therefore, the associate is not paid for the first hour of drive time to his/her work location of the day or for the last hour of drive time when returning home.

Plaintiff Kathi Bowman ("Bowman") was employed by Crossmark as a part-time retail representative from approximately March 2006 through July 31, 2008. She worked mostly in and around the LaFollette, Tennessee area. Plaintiff Cheryl Bean ("Bean")[2] was employed by Crossmark as a part-time retail representative from approximately May 2006 through October 2008. She worked primarily in and around the Kountze, Texas area.

Plaintiffs' position is that they are required to perform job-related activities in their homes before traveling to their first retail location and after returning home from their last retail location. Their contention is that because their work day begins with job-related tasks at home, the drive time to their first retail location should be part of the continuous workday and compensable. The drive time home should also be compensable because their workday does not end until they have completed job-related tasks at home after returning from the last retail location. Crossmark's position is that the administrative duties plaintiffs describe are not required to be done at home at a specific time and can be accomplished at

---

[2] Plaintiff Bowman filed the original complaint January 12, 2009. An amended complaint adding Bean as a named plaintiff was filed October 28, 2009 [doc. 16].

5

various times of the day and wherever the employee has access to the internet.

II.

*Legal Standard*

Pursuant to § 216(b), employees alleging an FLSA violation can bring suit on their own behalf or on the behalf of similarly situated persons if two requirements are met: "1) the plaintiffs must actually be 'similarly situated,' and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006) (citing 29 U.S.C. § 216(b); *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 167-68 (1989)). In *Comer*, the Sixth Circuit approved a two-stage inquiry employed by district courts in collective actions. The first step is the notice stage which occurs usually early in the case when the court determines whether notice of the lawsuit should be given to putative members of the class. *See Wilks v. Pep Boys*, No. 3:02-0837, 2006 WL 2821700, at *2 (M.D. Tenn. Sept. 26, 2006) (citing *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 366 (E.D. Tenn. 2006)). The second stage occurs after discovery and is undertaken if and when the defendant moves the court for decertification of a conditional class. *See Id.* at *2.

At the first stage, a named plaintiff must make a factual showing that "his position is similar, not identical, to the positions held by the putative class members." *Comer*, 454 F.3d at 546-47. Named plaintiffs can show they are similarly situated to putative

plaintiffs if they can "make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Id.* at 547 (quoting *Roebuck v. Hudson Valley Farms, Inc.*, 239 F. Supp. 2d 234, 238 (N.D.N.Y. 2002)). "At the notice stage, the district court makes a decision - usually based only on the pleadings and any affidavits which have been submitted - whether notice of the action should be given to potential class members." *White,* 236 F.R.D. at 366 (citation omitted). In addition, relevant factors at the notice stage include "whether potential plaintiffs have been identified, whether affidavits of potential plaintiffs have been submitted, whether there is evidence of a widespread discriminatory plan, and whether, as a matter of sound case management, a manageable class exists." *Jimenez v. Lakeside Pic-N-Pac, L.L.C.*, No. 1:06-CV-456, 2007 WL 4454295, at *2 (W.D. Mich. Dec. 14, 2007) (citing *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004)). Because of the minimal evidence at the first stage, the standard is fairly lenient. *White*, 236 F.R.D. at 366. If the case reaches decertification at the second stage, the court employs a stricter standard to analyze the similarly situated question. *See Comer*, 454 F.3d at 547 ("At the second stage, following discovery, trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated.").

In this case, however, plaintiffs did not move for conditional certification until almost one year after the case had been filed, and in that time considerable discovery directed toward conditional certification was conducted. In support of their positions, both parties

7

have submitted interrogatory responses; Bowman has submitted responses to requests for admission; Bowman's deposition has been provided; Crossmark has provided documents regarding its various policies at issue; and depositions and pleadings from a similar case pending in the Eastern District of New Jersey have been submitted by both sides.[3] The record before the court on the issue of conditional certification is several hundred pages in length. Thus, the court must determine what standard to apply.

In light of the limited but certainly substantial discovery that has been completed, this case is not in the notice stage when the court's decision is based only upon the pleadings and affidavits submitted. Courts faced with a similar circumstance have considered applying a standard that goes beyond the lenient standard employed at the early notice stage. In *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870 (N.D. Iowa 2008), the district court was addressing a collective action under the FLSA. Class discovery had been conducted, so there were interrogatories, company documents, and deposition testimony for the court to consider in deciding the issue of collective certification. The district court noted, "Thus, the court finds support for Tyson's argument that a more demanding standard should be required of Plaintiffs at this point." *Id*. at 894 (citing *Campbell v. Amana Co., L.P.*, No. C99-75 MJM, 2001 WL 34152094, at *2 (N.D. Iowa Jan.

---

[3] The district judge in the New Jersey case denied without explanation the plaintiffs' motion for conditional certification for "a class of all Retail Representatives who are or were employed by CROSSMARK at any time between January 1, 2006 and the present on the issue[] of . . . whether CROSSMARK has failed to pay straight-time or overtime wages for time spent by Retail Representatives driving from home to their first assignment each day, and from their last assignment to home at the end of each day."

4, 2001) ("finding merit in defendant's contention 'that the record in this case is beyond that which would warrant the leniency generally given in cases at the notice stage' because the action was 'filed nearly a year and a half ago' and '[d]epositions of nearly all named plaintiffs have been taken, Defendant have responded to two sets of interrogatories, and affidavits in support and opposition to the current motion have been filed'")). The *Bouaphakeo* court went on to perform the analysis under the first step for conditional certification, but then also performed the analysis under the second step. *Id*. at 897. ("[T]he court will not conditionally certify Plaintiffs' collective action class without meeting the more demanding standards under the second step.").

In *Thiessen v. General Electric Capital Corp*., 996 F. Supp. 1071 (D. Kan. 1998), the parties had engaged in three months of discovery concerning the opt-in group in a collective action. The court was not convinced that the record was sufficient "to permit an analysis under the 'higher' standard typically used at the post-discovery stage" and adopted an "intermediate" approach. *Id*. at 1081.

> Thus, the court adopts an "intermediate" approach in analyzing the "similarly situated" issue. To the extent the record has been developed, the court incorporates an analysis of the relevant factors found in post-discovery cases. The court actually makes its determination to provisionally certify, however, under a more lenient standard in light of deficiencies in the record.

*Id*. (footnote omitted). The three factors that are primarily considered at the second stage are: "(1) the disparate factual and employment settings of the individual plaintiffs, such as a) job duties; b) geographic location; c) supervision; and d) salary; (2) the various defenses

available to defendant that appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Pep Boys*, 2006 WL 2821700, at *3 (citing *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000)).

*Henry v. Quicken Loans Inc.*, No. 04-40346, 2006 WL 2811291 (E.D. Mich. Sept. 28, 2006) is another case in which the district court adopted the approach of using analysis from the first and second stages of conditional certification because of the amount of discovery that had been conducted. In *Henry*, the plaintiffs withdrew their first motion for conditional certification, and by the time their second motion was filed, eighteen months of discovery had been completed. The district court adopted the recommendation of the magistrate judge that "the Court consider factors from both the first and second phases of the inquiry to determine whether Plaintiffs are similarly situated." *Id.* at *5 (citing *Basco v. Wal-Mart Stores Inc.*, No. Civ. A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).

In *Basco*, substantial discovery had been completed, and the court therefore determined that it would "consider the criteria for both the first and second steps in deciding whether it should certify this matter." *Basco*, 2004 WL 1497709, at *4. The district court also went on to observe the following before conducting its analysis:

> Because the aim of collective actions is to promote judicial economy, and substantial discovery has already been undertaken such that the Court can make an educated decision as to whether certifying this matter as a collective action would survive the decertification process, the ends of judicial economy [ ] require the Court to make that enquiry at this stage. To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for

10

> same prior to its certification would be an exercise in futility and
> wasted resources for all parties involved.

*Id.* at *5.

The case before this court is not in the typical "notice stage" in that substantial discovery has been completed. Therefore, application of the lenient standard employed at the notice stage would not be appropriate. The court agrees with the procedure discussed above whereby a more demanding standard is applied after considerable discovery has been conducted, and this review standard includes a consideration of the factors employed at the second or decertification stage of the analysis.

III.

*Analysis*

First Stage - Similarly Situated

At this stage the plaintiffs can demonstrate that they are similarly situated by showing that they have been subjected to a common policy or plan that violates the law. Plaintiffs attempt to do this by claiming that they are not compensated for drive time. However, in order to cast Crossmark's pay and drive time policies in a light that shows violation of the FLSA, plaintiffs must rely on the continuous workday rule and must demonstrate that they perform integral and indispensable administrative tasks in their homes at the start and end of their workdays. There is no showing that Crossmark's driving policy itself violates the FLSA as the Portal to Portal Act of the FLSA, 29 U.S.C. § 254(a), does not

require employers to compensate employees for "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a)(1). Thus, plaintiffs want to show that their continuous workday begins and ends with administrative tasks at home so they can be compensated for the drive time to and from their first and last store locations.

The two plaintiffs in this case are seeking a conditional certification for all retail representatives nationwide. Yet, in the court's opinion, they have not shown sufficient similarity to warrant conditional certification. Crossmark's written job description for sales representatives and its policies concerning the performance of administrative tasks does not specify when or where representatives are to complete administrative tasks and responsibilities. While the job description indicates that work needs to be reported the day it is performed, it can be recorded once the work is completed and wherever the employee has access to the internet. The evidence in the record does not support plaintiffs' contention that retail representatives nationwide perform their administrative duties exactly as they do and that they are required to perform the tasks as they do. Individual supervisor preferences and requirements come into play in how such tasks are performed.

In addition, there are different types of retail representatives. The ISE teams are retail representatives who perform very minimal or no administrative tasks at all. Their work involves re-setting categories of products that includes moving products and store shelves. They rarely engage in other types of merchandising or inventory services. ISE

employees receive their instructions in store and from the retail customer. Therefore, these retail representatives do not have to check email daily for instructions from their supervisors. They also do not need to review their schedules daily or to confirm work has been performed per the schedule. The record also reflects that approximately one third of Crossmark's retail representatives are ISE team members and perform only ISE work. ISE team retail representatives would not engage in the same conduct as these named plaintiffs and would not be encompassed by their legal theory as to when the continuous workday begins, the basis for their driving time compensation claim.

Also, at the initial stage the court can look at "whether potential plaintiffs have been identified, whether affidavits of potential plaintiffs have been submitted, . . . and whether, as a matter of sound case management, a manageable class exists." *Jimenez v. Lakeside Pic-N-Pac, L.L.C.*, No. 1:06-CV-456, 2007 WL 4454295, at *2 (W.D. Mich. Dec. 14, 2007). This case was filed on January 12, 2009, and to date the only plaintiff who has been added to the lawsuit is Cheryl Bean. The record indicates that plaintiffs have made inquiries in an attempt to have others join the lawsuit; however, no others have done so thus far. There are a few affidavits from Crossmark employees who have indicated that they have no interest in joining the case. The court can also look at whether a manageable class exists. In the court's opinion, one does not. Plaintiffs are seeking a nationwide class comprised of approximately 12,000 employees. A class of such proportion covering such a vast geographical area would present a multitude of management and logistical problems. The

13

court, therefore, concludes that plaintiffs have not shown they are similarly situated to other putative class members.

### Second Stage - Application of Relevant Factors

The court has concluded that the plaintiffs have not met their burden of showing they are similarly situated based on the considerations from the initial stage of the conditional certification analysis. Nevertheless, because it is appropriate to apply a higher standard in the analysis of this case, the court will also address the factors considered at the second stage of the certification analysis.[4]

The first factor is "the disparate factual and employment settings of the individual plaintiffs." *Thiessen*, 996 F. Supp. at 1081. Both named plaintiffs are former part-time retail representatives who claim they had to perform administrative tasks before leaving home and after returning home. Retail representatives are also full-time and part-time surge employees. The record indicates that full-time representatives have regular work schedules and do not have to check for more work on SalesTrak each day. Part-time surge representatives on a given day or week may have little or no work and will not have administrative tasks to perform during such times.

---

[4] Although the parties have not fully briefed all of these factors, because of the discovery that has been completed and the hundreds of pages of submissions that comprise the record, the court finds it appropriate to address these factors as part of its conditional certification analysis.

Further, the record shows that the various divisions or teams of retail representatives may perform administrative tasks using different methods. A majority of dedicated team members use hand-held devices to do and track their work. These hand-held devices are taken to retail store locations and retail representatives perform some administrative tasks using these devices at the stores. Work time is recorded on these devices rather than on a laptop or home computer.

In addition, supervisors can give different instructions to their retail representatives regarding how often to check emails. One supervisor may want representatives to check email twice a day and others want representatives not to check email or do administrative tasks on days they are not working in store locations. Also, the ISE team representatives perform different job duties in the retail stores and perform minimal or no administrative tasks because of the nature of their assignments.

The factual settings for retail representatives vary significantly, especially with regard to what administrative tasks are performed, and when, where, and how such tasks are performed. ISE representatives do virtually no administrative tasks. Dedicated representatives use a hand-held device that is carried and used in the retail locations for administrative tasks. These are just some of the differences apparent in the record showing that retail representatives perform their job responsibilities and administrative tasks differently and not necessarily in the same manner as the two named plaintiffs. The court concludes that the factual settings of potential plaintiffs do not support a finding that they are

15

similarly situated.

The second factor is "the various defenses available to defendant which appear to be individual to each plaintiff." *Id*. The court anticipates that defendant arguably would want to make individualized inquiries as to each retail representative concerning what administrative tasks are performed and when, where, and how often such tasks are performed. As noted above, plaintiffs' claim for being compensated for the drive time at issue is based on their contention that the continuous workday begins at home when they engage in administrative tasks before leaving for the first retail location. However, the job description for retail representatives and the evidence regarding Crossmark's policies do not show that administrative tasks must be performed before leaving home or after returning home. There is not a set time or place where they have to be performed according to the evidence. The members of the proposed class of retail representatives are located throughout the country and work in different divisions for different supervisors who have specific requirements regarding the performance of administrative tasks. Some representatives perform administrative tasks with hand-held devices or, like the ISE representatives, perform little or no administrative tasks. Because of these differences, the court foresees defendant wanting to establish when the continuous workday begins for each retail representative. Crossmark will likely also assert a *de minimis* defense that would require individual inquiries as well. The court concludes that the second factor does not support collective treatment of this action.

The third factor for consideration is "fairness and procedural considerations." *Id*. The court envisions tremendous case management problems if this case were to proceed as a collective action. The proposed class members are located nationwide, wherever Crossmark has retail representatives working. These thousands of employees are not only located in different geographical areas, but they are members of different classes of employees – full-time, part-time, part-time surge – and work in different divisions or on different teams of representatives. These retail representatives are subject to the individual requirements of many supervisors throughout the country, supervisors who have specific preferences or rules regarding administrative tasks. The court concludes that the management of such a class would be nearly impossible and could potentially lead to the misuse of litigant and judicial time and resources. Thus, this factor as well supports the court's conclusion that this case is not appropriate for collective action.

Accordingly, for all of the reasons stated herein, plaintiffs' motion for conditional certification will be denied. An order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge